## Woodall v. Commonwealth.

(Decided May 31, 1932.)

C. R. LUKER for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE DIETZMAN—
Affirming.

Indicted for the offense of murder, the appellant was convicted of the offense of manslaughter and sentenced to serve ten years in the penitentiary. He appeals.

One evening in June, 1931, Bev Little, Sr., was killed by the appellant. Before supper that evening, the appellant who lived in the same neighborhood with Bev Little, Sr., and who was on friendly terms with him, came to the home of Bev Little, Sr., for the purpose of purchasing a a hog from Bev Little Jr., a young man some 20 years of age. After completing the purchase, appellant left, intending to return the next day for the hog, but soon concluded that he would get the assistance of Bev Little, Jr., that evening in taking the hog to his home. So he returned to the home of Bev. Little, Sr., and got Bev Little, Jr., to help him get the hog over to his home. According to Bev Little, Jr., when they reached the home of appel-

322

lant, the latter invited him in and regaled him, as well as himself and appellant's wife, with a quantity of home-brew and to such an extent that both he and appellant became drunk. According to appellant, however, no drinking took place at all. He denied that he had any home-brew or other liquor on the place, and stated that all they did at this time was to sit on the front porch while appellant's wife picked the banjo. At all events, after an hour or so, some one suggested that they all go over to the home of Walter Rush, who was giving a party that night. Appellant at first demurred on the ground that he had not been invited. At last, according to Bev Little, Jr., they determined to go anyhow. According to appellant, he agreed only to walk part of the way to the Rush home with Bev Little, Jr. Before departing, the appellant equipped himself with his pistol, and, having only one cartridge in it, he borrowed two others from Bev Little, Jr. The appellant, his wife, and Bev Little, Jr., then set out towards the Rush home. They had to pass the home of Bev Little, Sr., where Bev Little, Jr., also lived. As they did so, Bev Little, Jr., feeling that, being unarmed, he was ill equipped to go to a social gathering went into the house to properly accouter himself with a gun before going on to the party. When he got in the house, he fell over a chair, which woke his father, who upbraided him for being drunk. It seems as though the father had had a great deal of trouble on account of the drinking habits of Bev Little, Jr., and had 'been much worried by the boy's conduct. Bev Little, Sr., also protested when he learned from Bev Little, Jr., that the latter intended going to the party, as he thought his son was in no condition to attend a social function. The boy, however, persisted in his purpose, and, after securing his gun, went on out and joined appellant and his wife. The three then continued on their way to the party.

When they reached the front gate of Rush's premises, Bev Little, Jr., and appellant stopped while appellant's wife went on up to the Rush home. It is intimated by the commonwealth that this arrangement was resorted to in order that Mrs. Woodall might procure an invitation to the party for her group. Up to this point there is but little dispute in the evidence except as to the drinking at appellant's home. From now on the evidence of the commonwealth and that of appellant dif-

fer sharply. According to the proof of the commonwealth, Bev Little, Jr., who was the only eyewitness to the homicide the commonwealth had, Bev Little, Sr., came up to where appellant and Bev Little Jr., were talking and upbraided appellant for getting Bev Little, Jr., drunk. Appellant denied that he had gotten Bev Little, Jr., drunk and called Bev Little, Sr., a liar, whereupon Bev Little, Sr., knocked him down with his fist. As appellant rose, Bev Little, Sr., again knocked him down with his fist. Appellant rose again and walked off some distance, stopped, turned around, and called back to Bev Little, Sr., saying in substance:

"We have been living out here neighbors a long time and never have had no trouble and I want us still be that way. I don't deny getting Bev drunk but come up here and let's me and you talk this matter over and be friends like we have always been."

In response to his invitation, Bev Little, Sr., walked towards the spot where appellant was standing, and, as he neared appellant, the latter fired into Bev Little, Sr., the three shots he had in his pistol. Bev Little, Sr., sank to the ground. Bev Little, Jr., then pulled his gun and pursued appellant shooting him and wounding him quite severely. Dale Little, a younger son of Bev Little, Sr., was at the party in the Rush home. Hearing the shots and his father's voice, he rushed down to where his father was lying on the ground. He lifted his father in his arms, and, as he did so, his father gasped out with his dying breath:

"Logan Woodall killed me. He said for me to come up here and make friends and I went up to shake hands and he shot and killed me."

With these words the spirit of Bev Little, Sr., took its flight.

On the other hand, the proof for the appellant is that, as he was standing by the front gate of the Rush home talking to Bev Little, Jr., the latter's father without warning or notice to the appellant, and without the appellant being even aware of his presence, came up behind appellant and knocked him down with a fence rail; that as appellant arose Bev Little, Sr., knocked him down the second time with the fence rail, which was broken by the force of the blow; that Bev Little, Sr., then reached

for another fence rail, and as he did so appellant arose again from the ground and retreated towards the Rush home; that Bev Little, Sr., on securing another fence rail, followed appellant up, and that, as he was about to strike appellant a third time, the latter fired the three shots which killed Bev Little, Sr.; that appellant then turned and ran, being pursued by Bev Little, Jr., who shot him as hereinbefore stated.

With these facts in mind, we now turn to the contentions of appellant as to why this judgment should be reversed. He first argues that the demurrer to the indictment should have been sustained; but, aside from citing the case of Lyttle v. Commonwealth, 195 Ky. 729, 243 S. W. 1037, he offers no reason or argument in support of this contention. The indictment is in the standard form. We have read the Lyttle case, and are utterly unable to ascertain its applicability to any possible criticism of this indictment. The Lyttle case went off on the question of duplicity in the indictment. There is no such question presented by the indictment in the instant case.

It is next contended that the verdict of the jury is not sustained by the evidence, and is the result of passion and prejudice. The resume of the evidence pro and con given above is a sufficient answer to this contention. If the commonwealth's testimony was to be believed, as the jury had a right to do, the verdict was abundantly sustained by the evidence.

Appellant next urges that the court erred in admitting incompetent evidence for the commonwealth and rejecting competent evidence offered by him. Under this heading, the first claim is that the court erred in permitting Bev Little, Jr., to relate what happened in his home when he went in to get his pistol. Conceding solely for the argument's sake that such evidence was incompetent, yet it plainly was not prejudicial. Bev Little, Jr., testified that he was drunk on the occasion in question, and that his father knew that he was drunk. His father's knowledge of the claimed condition of Bev Little, Jr., was competent as tending to explain why Bev Little, Sr., followed his son and appellant to the Rush home. Indeed, when properly analyzed, it was beneficial to appellant as tending to show anger on the part of Bev Little, Sr., and to establish that he was the aggressor in the difficulty which followed. The next claim is that it was error to

permit Bev Little, Jr., to testify that appellant was also drunk at the time of the homicide. This was competent as showing the facts at the time of and surrounding the homicide. The testimony of Mrs. Bev Little, Sr., to the effect that her son was drunk was clearly competent. It explained why Bev Little, Sr., followed the appellant and Bev Little, Jr., to the Rush home. The next claim is that the admission of the dying declaration was error. The main attack in appellant's brief on this dying declaration is to the effect that Dale Little lied on the stand in saying that his father had made any dying declaration, because, as it is argued, the father, shot as he was, was dead before Dale Little arrived on the scene, and hence could not have made a dying declaration. However, this is an argument to be addressed to the jury, and goes to the credibility of the witness rather than the competency of the testimony. Postell v. Commonwealth, 174 Ky. 272, 192 S. W. 39; Calico v. Commonwealth, 206 Ky. 271, 267 S. W. 167. This evidence was clearly competent. Luker v. Commonwealth, 5 S. W. 354, 9 Ky. Law Rep. 385; Smith v. Commonwealth, 216 Ky. 832, 288 S. W. 768.

Coming now to the claim that the court rejected competent evidence offered by appellant, we find that the first item on this score is that the court erred in declining to permit the appellant to state that he was armed on the occasion he killed Bev Little, Sr., because he customarily carried a gun. It is true that on direct examination he was not permitted to so state, but on cross-examination, when asked "why had he come to carry this pistol over to the Rush home," he answered:

"I said always when we both leave the house I took it along."

"Q. Why? A. My father gave me the pistol on his dying bed and I was always afraid some one would steal it at the house. It had been broke into."

So, conceding that the evidence was competent, appellant got the benefit of it on the cross-examination. The next item is that appellant was not permitted to tell the jury whether or not Bev Little, Sr., appeared to be "mad" at the time of the fight down by the Rush gate. It will be remembered that appellant had testified in detail that without any offense on his part, Bev Little, Sr., had knocked him down twice with a fence rail. Unquestionably the jury, if it believed such evidence, would

have known that Bev Little, Sr., was in no sportive mood at the time. The next item is that the court erred in refusing to permit one or two witnesses for the appellant who were at the Rush home to testify that just before the shooting they heard somebody down in the direction where the fight was going on "begging." The court did permit some six or seven witnesses to testify that just before the shooting they heard some one whose voice they did not recognize say, down in the direction where the fight was going on: "Please don't do that; please don't do that." Thus appellant abundantly established what did transpire in this connection down at the scene of the fight. The few witnesses whom the court declined to allow to state that they heard "begging" were unable to say just what the words they heard were and no doubt the court excluded their testimony on the theory that it was but their opinion and conclusion of what was being said at the fight. But, even conceding the court erred in this connection, it was so abundantly and without contradiction proved by other witnesses that some one down at the scene of the shooting said, "Please don't do that; please don't do that," that whatever error the court committed was not prejudicial to appellant's substantial rights. The next item is that a witness was not permitted to state that, when he went to the home of appellant on the evening after the shooting, he could not discover any signs of home-brew at the house. However, appellant proved by Mrs. Jasper Porter that she went around to appellant's house the morning after the shooting, made a thorough search of the house and found no home-brew there. No doubt the reason the court excluded the testimony of the witness who went there the following night was because it was not shown that the conditions had remained unchanged during the intervening 24 hours. On this basis, the court rightly excluded it; but, as appellant did show by Mrs. Porter that there was no home-brew there the morning after the homicide, he got the benefit of his contention after all. There are several other minor items with regard to the admission and rejection of testimony, but there is so little merit in them that they need not further be discussed.

The next ground appellant relies upon for a reversal is that the court failed to properly instruct the jury. As to this, he says that the instruction on voluntary manslaughter failed to require the homicide to have been

done willfully, intentionally, or unlawfully. He is in error as to this, for the instruction distinctly predicated the finding of a verdict of voluntary manslaughter on the premise that the homicide had been willfully and feloniously done. In a subsequent instruction, "willful" and "willfully" were defined as "intentional, not accidental or involuntary." The instruction with its terms defined as they were is the one found in Hobson's Instructions to Juries, p. 890, and has been approved by this court many times, as may be seen on reading the citations appended to the form in Judge Hobson's book, supra. Appellant's criticism that the instruction on voluntary manslaughter was erroneous in that in the expression, "or under such provocation as was reasonably calculated to excite the passion of the defendant beyond the power of his control," it used the word "reasonably" when it should have employed the word "ordinarily," is without merit. The use of the word "reasonably" as here has been approved many times by this court. Gordon v. Commonwealth, 136 Ky. 508, 124 S. W. 806; Kennedy v. Commonwealth, 102 S. W. 863, 31 Ky. Law Rep. 546; Hobson, supra, p. 898. The self-defense instruction criticized is the standard one on this subject. Hobson, supra, p. 898.

Appellant's final ground for reversal is based on the contention that the judge of the trial court was guilty of misconduct in the presence of the jury. Appellant criticizes the conduct of the trial judge because in overruling appellant's objection to the admission of the dying declaration of Bev Little, Sr., the trial judge went at some length into his reasons, citing authorities in support of his position. Aside from the fact that this was done out of the presence of the jury, we are at an utter loss to understand how it can be contended that such action was misconduct on the part of the judge. Appellant also points out how, after the court had admitted what was undoubtedly incompetent evidence offered by appellant, he, in refusing to permit appellant to introduce further like incompetent evidence, remarked to the jury that he had mistakenly allowed the incompetent evidence that did get in to be admitted but that he would leave it with them. There was no misconduct here, as the trial judge would have been warranted in withdrawing that incompetent evidence from the jury. Finally it is said that the trial judge would not let appellant make avowals on the exclusion of evidence offered by him. But one inci-

328

dent of this character appears in the record. It is not quite clear why this one incident happened, but by his bill of exceptions appellant did get in what he claims his witness would have testified to. The evidence was not very material, and appears to be at variance with what the witness did testify to. There was no prejudicial error committed here to the hurt of appellant.

The judgment is affirmed.